# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

Tamara L. Giwa
*Executive Director*

Michelle A. Gelernt
*Attorney-in-Charge*

July 10, 2026

**Via Email and ECF**
The Honorable Eric N. Vitaliano
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:    **United States v. Dan Sohail, 26-CR-127 (ENV)**

Your Honor,

I write in anticipation of sentencing, currently scheduled for July 28, 2026. Dan Sohail is a thoughtful and kind-hearted thirty-six-year-old man with no criminal history, who survived an abusive childhood and adolescence. His formative trauma was never met with mental health care, leaving him to battle depression and post-traumatic stress disorder without any appropriate tools. At the same time, Mr. Sohail desperately sought belonging and understanding through his exploration of Judaism. In January of this year, gripped by mental illness, Mr. Sohail irrationally drove his vehicle into the Chabad Headquarters—home of an entity that had welcomed and embraced him, and in which he had sought acceptance. Rather than an act of hate, as it reasonably appeared at first blush, Mr. Sohail saw his actions as a desperate call for help. Though illogical and severely misguided, his conduct brought him here, to this crossroads. Mr. Sohail has spent six months in custody reflecting on his circumstances. Fueled by remorse and regret, he recognizes that he needs support and he welcomes it. Mr. Sohail has already served a top-of-the-Guidelines sentence. We respectfully recommend a sentence of time served, to be followed by one year of supervised release, with mandated mental health treatment,

Enclosed are three supporting documents. Exhibit A is a psychological report by Dr. Bryan Stuart, Psy.D., which diagnoses Mr. Sohail with Post-Traumatic Stress Disorder (PTSD) and Other Specified Personality Disorder, and makes significant treatment recommendations.[1] Exhibit B is a letter from Allison Berger, LMSW, who is a Federal Defenders of New York mitigation social worker. Exhibit C is a letter of support from Dorota Sohail, Dan's mother.

## I.    The Presentence Investigation Report

Mr. Sohail has no objections to the Presentence Investigation Report ("PSR"), which accurately captures his offense conduct, guidelines calculation, lack of a criminal history, and

---

[1] Mr. Sohail respectfully requests to file this psychological report under seal, as it contains personal medical information. Non-sensitive material is cited publicly in this submission.

personal history. Notably, the PSR reflects a Total Offense Level of eight, and a criminal history score of zero, producing a Guidelines recommendation of imprisonment from zero to six months. PSR ¶¶ 22, 25,63.

Paragraph Eight of the PSR merits special attention. Mr. Sohail is deeply grateful to the government and the Probation Department for their willingness to examine his case thoughtfully and to look beyond its initial impressions. When Mr. Sohail was first arrested and charged in state court, he faced hate crime charges. PSR ¶ 30. Once federal prosecutors fully investigated his case, they concluded that "the evidence does not indicate that the instant offense was motivated by hate or animus, despite damage to the building being intentionally caused." PSR ¶ 8. "The Probation Office agrees that [the Hate Crime] enhancement is not applicable as the heightened burden of proof has not been met." *Id*. Mr. Sohail agrees, and submits that the resulting calculation is both accurate and appropriate.

## II.    Mr. Sohail's Regrettable Conduct Stemmed from Trauma, Untreated Mental Illness, and a Search for Belonging

Dan Sohail has spent his entire life "searching for purpose rather than giving up." Ex. C at 1. With "a kind heart and genuine compassion," "he explored religion and faith in an effort to find hope and cope with what he was experiencing internally." *Id*. As a child and adolescent, Mr. Sohail, along with his mother and brothers, suffered severe physical and emotional abuse at the hands of his father. PSR ¶ 34. His father was "terrifying when he was drunk," which was routine. Ex. A at 2. He would regularly beat Dan with objects, and the police were frequently called to the home to respond to his father's domestic violence. PSR ¶ 34. His father also attempted to control his sons by exerting a distorted version of his faith upon them. Ex. A at 2. When he was a teenager, Mr. Sohail's father required him to attend a far-away religious retreat without family supervision, where he was stabbed in the abdomen with a knife. *Id*. When he was in his early twenties, his father abandoned him on the side of the road at a far-away truck stop over a minor disagreement. Ex. B at 2. These experiences left Dan unmoored, anxious, socially alienated, and paranoid. Ex. A at 6.

As Mr. Sohail grew older, he made a concerted effort to establish a steady, self-reliant life, but he was always held back by the increasing grip of mental illness. He graduated from high school and completed specialized vocational training. PSR ¶ 48. He has been able to consistently maintain employment, though his jobs do not reflect his intellect or his potential. For the last several years, Mr. Sohail was working two jobs simultaneously, as a generator technician and a lawn care technician. His work hours varied heavily by the season, working significantly over forty-hour weeks during the warmer months, offset by collecting unemployment benefits in the winter, due to the nature of his work. At the same time, Mr. Sohail struggled to develop and maintain personal relationships as he felt increasingly hopeless, mistrustful of others, and alienated. Ex. A at 6. In the three years leading to his arrest, Mr. Sohail held down his two jobs while intermittently living out of his car, despite a solid income, demonstrating his instability. *Id*. at 3. The same tension befell his family relationships. Bonded closely to his mother and brothers

through their shared developmental trauma, he earned "the unwavering love, encouragement, and support of his family as he works to rebuild his life," and in turn, "he loves his family deeply." Ex. C. at 2. But his mother reports that "as his mental illness progressed, those relationships became strained," creating "distance, confusion, and pain for all of us." *Id.*

Mr. Sohail's isolation and search for belonging caused him to seek acceptance in the Jewish community. As a child, Mr. Sohail recalled his father sharing with him that his Pakistani ancestors were members of "the lost tribe of Israel." Ex. C at 3, *see, e.g.*, Baruch Kogan and Harry Rozenberg, "The Afghan Pashtuns and the missing Israelite exiles," *The Jerusalem Post* (Feb. 21, 2018), at https://www.jpost.com/opinion/the-afghan-pashtuns-and-the-missing-israelite-exiles-543181 ("[O]ur organization, iTribe, polled almost 100 Pashtuns in Afghanistan and Pakistan. Almost all responded that they were told by their grandparents that they are called Bani Israel, the Children of Israel."). As he shared with the NYPD at the time of his arrest, Mr. Sohail "stated that he had recently learned that he had Jewish heritage and was in the process of learning more about the Jewish tradition." PSR ¶ 4. He "began seeking contact with rabbis and other members of New Jersey synagogues." Ex. A at 4. But as he became increasingly desperate for acceptance in the Jewish community, his behavior became alarming. He was sent away from a New Jersey Chabad and encouraged to attend the Chabad at 770 Eastern Parkway in Brooklyn. He did so, and found the rabbinical students there warm and welcoming. He danced with them and understood them to have celebrated his Bar Mitzvah. They encouraged him to visit Israel, and he did so. But when he returned, his mental status had become increasingly unwell. He was "begging" members of 770 for help. Ex. C at 4. At home, he became erratic and extremely anxious. Ex. A at 8. Within a week, he had committed the instant offense. It was an irrational cry for help.

The period immediately preceding and then following Mr. Sohail's conduct reflects a similar tension between responsibility and illness. Before driving his vehicle into the building, he got out of his car and "gestured for various congregants to move away from the entrance to the building." PSR ¶ 3. As a result, "nobody was injured during the incident." *Id*. When the police arrived at the scene, Mr. Sohail did not run. He turned himself in immediately, looking confused, disheveled, and wearing shorts, though the January weather was well below freezing temperatures. Mr. Sohail immediately presented as ill, not hateful. Then, after one month on Rikers Island, Mr. Sohail was unexpectedly transferred into federal custody on the Jewish holiday of Purim. This unmoored him, too, as he had found community with Jewish inmates in city custody. PSR ¶¶ 5, 6. Mr. Sohail spent the first month of his federal custody paranoid and isolated, afraid to come out of his cell, come to court or meet with his legal team. *Id*. at ¶¶ 38, 39, 46. By April, Mr. Sohail began to accept that he needed help—legally and psychologically. He began meeting with undersigned counsel and Ms. Berger on a regular basis, reconnected with his mother, and was open and forthcoming with a psycholog. Watching the video of his offense conduct, Mr. Sohail is horrified. While he accepts what he did, he realizes that it did the opposite of bringing him acceptance in the Jewish community. Over more than four months, he has faced the struggles he has been surviving for his whole life. He now recognizes that he cannot get better on his own. He has expressed to his legal team, to the Probation Department, to his family,

and to an independent psychologist that he is open to mental health treatment, and that he understands it will be required as part of his sentence.

**III.   <u>A Sentence of Time Served, to be Followed By Supervised Release that Includes Intensive Mental Health Treatment, Meets the Goals of Sentencing</u>**

Mr. Sohail has been in custody since his arrest on January 28, 2026, or exactly six months on his sentencing date. We respectfully submit that a time-served sentence, within the Guidelines recommendation of zero to six months, is appropriate here, and that any longer sentence is greater than necessary. Although Mr. Sohail's crime quite reasonably evoked concern, particularly during a time of heightened antisemitism, the government rightly concluded that it was not motivated by animus. Rather, it was a manifestation of mental illness. So that Mr. Sohail can begin the difficult work of engaging in intensive mental health treatment, we urge the Court to release him. Dr. Stuart has proposed as outline of a treatment plan to assist Mr. Sohail's eventual clinicians. *See* Ex. A at 11. Each of these recommendations can be well supported by the Probation Department. Mr. Sohail will also have the continuing support of Ms. Berger and this office. *See* Ex. B at 4. And he has a stable residence at his mother's home, so long as he remains compliant with treatment, in addition to her love and emotional support. Ex. C. Ultimately, this is a property crime, for which Mr. Sohail caused under $20,000 in damage. So that he may make amends by quickly repaying that bill, he is eager to find work, as he has always done. Taken together, Mr. Sohail's lack of a prior criminal record, his personal history, his family support, and his willingness to accept help reduce his risk of recidivism. All these factors support a time-served sentence.

Thank you for your consideration.

Respectfully Submitted,

<u>      /s/      </u>
Mia Eisner-Grynberg
Deputy Attorney-in-Charge
(718) 330-1257

cc:   AUSA Eric Silverberg (by email and ECF)
      AUSA Brachah Goykadosh (by email and ECF)
      USPO Erica Vest (by email)

# EXHIBIT A
# Filed Under Seal

# EXHIBIT B

# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Fl., Brooklyn, NY
11201 Tel: (718) 330-1200  Fax: (718) 855-0760

Tamara L. Giwa
*Executive Director and
Attorney-in-Chief*

Michelle A. Gelernt
*Attorney-in-Charge*

July 2, 2026

Honorable Judge Eric N. Vitaliano
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:    *United States v. Dan Sohail, 1:26CR00127*
       *Letter of Support*

Dear Honorable Judge Vitaliano:

This letter is submitted to the Court in its careful consideration of Mr. Dan Sohail's upcoming sentencing. Mia Eisner-Grynberg, Mr. Sohail's attorney, referred to this case to me, a Mitigation Social Worker at the Federal Defenders of New York, to provide support to Mr. Sohail while he navigated his transition from Rikers Island to the MDC Brooklyn, to help us all gain a better understanding of his lived experiences and circumstances leading up to the instant offense, and to help him maintain stability in the community when he is released from the sentence that is imposed.

On January 28, 2026, Dan was arrested by the NYPD at 770 Eastern Parkway, in Brooklyn, upon driving his vehicle into the door of the Chabad Headquarters. Police body worn camera footage from the night of the arrest shows a scene of confusion on the faces of parishioners and on Dan himself as he exits his vehicle. The resounding question being asked was "what just happened?" and "why?" Understandably, the Chabad community feared that this incident was a violent act of antisemitism. The Jewish community was left shaken, and Dan was mixed-up, overwhelmed, and hating himself for what he had done. "Why did I do that?" He questioned. His long undiagnosed, untreated, mental health condition had culminated in religious preoccupation and a sincere cry for help from a community that he respects.

Following his arrest, Dan was remanded to the custody of the New City Department of Corrections while his case was being prosecuted by the Kings County District Attorney's Office. On March 2, 2026, Dan's case was transferred to the U.S. District Court in the Eastern District of New York, and he was remanded to the custody of the Bureau of Prisons. I observed Dan for the first time, in court, on the same day. He appeared in a khaki-colored uniform, with shoulder length hair, a long beard, and a yarmulke proudly donned on his

head. Shortly thereafter I began meeting with him at the MDC Brooklyn and I would learn that there was more to this case, and this man, that meets the eye.

My meetings with Dan, which have occurred both in-person and over video calls over the span of five months, have been enlightening. Dan is a soft-spoken and kind-hearted man, who has been experiencing profound mental health struggles. For many years he has felt lost. He is seeking support, meaning, and forgiveness through this experience. Dan is willing to do whatever he can to make amends to the congregants of the Chabad and the Jewish community that he has felt a deep connection to.

*An upbringing marked by significant domestic violence*

As detailed in the Pre-Sentence Report (PSR) and the expert report prepared by Dr. Bryan Stuart, Dan is a thirty-six-year-old man, who witnessed and experienced significant violence at the hands of his father throughout his childhood. His father, who had a severe drinking problem, was physically, emotionally, and psychologically abusive towards him, his mother, and his two younger brothers. Dan's mother and brother, Wesley, each stated to me that Dan absorbed the most egregious abuse of the three sons and that abuse has had a lasting effect.

Dan's father, a man of Pakistani descent, desired that his sons be practicing Muslims and as a result he enforced religion onto them. It appears that Dan made the sincerest attempts to pursue religion, at his father's behest. Dan felt conflicted by his father's demands, as his father touted being devout, but drank heavily and engaged in horrific violence in the home. Dan moved farther away from Islam when he attended a religious retreat in Michigan at the age of fourteen and was stabbed in the abdomen by an adult.

As Dan moved into young adult and adulthood, his relationship with his father further deteriorated. His brother, Wesley, shared a story with us that highlighted his father's cruelty and abusive treatment towards Dan. When Dan was in his early twenties, his father, a truck driver, demanded he join him on the road because he wanted his son to make trucking his career. While at a rest stop in another state, in a place unfamiliar to Dan, he and his father got into a minor disagreement over a cup of coffee. Dan allegedly told his father it was impolite to place his coffee cup on the steps of another truck driver's vehicle. His father did not appreciate his son's feedback, got back in his truck without Dan, and abandoned him at the rest stop leaving him alone without any resources to get home.

When Dan was twenty-seven, his father left his mother for another woman and relocated to Pennsylvania where he resides today. Decades of abuse may have ended for Dan, his mother, and his brothers but the long-lasting impact persisted. There is no doubt that Dan's childhood was rife with adverse experiences. The Adverse Childhood Experience (ACE) Questionnaire is a ten-question form that measures childhood trauma by identifying the presence of physical abuse, verbal abuse, physical neglect, and emotional neglect. It also

considers the prevalence of a parent/guardian abusing substances, domestic violence, a family member diagnosed with a mental illness, and the disappearance of a parent through divorce, death, or abandonment. The presence of each type of trauma is weighed as 1 point if the participants answer "yes" to questions about the first eighteen years of their life. A score higher than three suggests that the participant experienced toxic stress as a child. This kind of childhood stress can be an indicator of a range of health and social problems including interactions with the legal system.[1]   Dan endorsed four questions on this questionnaire including verbal abuse/fear, physical abuse, witnessing intimate partner violence, and living with a problem drinker. A score of four is high and suggests that his childhood experiences resulted in toxic stress.

*Trauma and undiagnosed mental illness result in instability and cries for help*

Dan's actions caused damage to a religious building and undue fear to an already anxious community. As I have gotten to know Dan better, by way of meetings with him (where he is engaged and open), the consistent help of his family, and the clinical assessment conducted by Dr. Stuart, we have learned that Dan has been struggling with undiagnosed mental health conditions for a significant period. This arrest and sentencing are a turning point in Dan's life – it is a much-needed intervention.

Dr. Stuart's thorough psychological report provides a detailed clinical description, diagnoses, and recommendations for community-based treatment (treatment he will be unable to receive while incarcerated). For the first time, Dan has clear diagnoses that will provide a framework for recovery. Dr. Stuart found that Dan is living with Post Traumatic Stress Disorder (PTSD) and Other Specified Personality Disorder. While he presents with severe depressive symptoms and some delusional thoughts, he is not driven by "psychosis or predatory intent."

Dan's untreated conditions have caused worry amongst his family and sense of helplessness for much of his adult life. For years, he isolated himself as he tried to make sense of the confusion and hopelessness he felt. Judaism, not his mother's religion (Catholic) nor his father's religion (Islam), became his touchstone. His father once shared a story with him that his Pakistani ancestors were members of "the lost tribe of Israel." This memory opened a door that led him down a path of discovery, feelings of acceptance, and new motivations to seek guidance from Judaism. His mental health status at, and around, the time of the instant offense was very poor. The outreach he made for connection and spiritual help was misguided, chaotic, sometimes delusional, and unintentionally frightening.

With a clear diagnosis, we now have a pathway for recovery. While engagement in mental health treatment will be new to Dan, he is interested in exploring his feelings of anxiety

---

[1] Levenson, J., Willis, G., & Prescott, D. (2014). Adverse childhood experiences in the lives of male sex offenders: implications for trauma-informed care. *Sex Abuse: A Journal of Research and Treatment,* 1-20.

3

and depression, which at times feel uncontrollable. Up until this point he has never had the opportunity to learn skills to manage his PTSD, nor has he ever considered the negative impact his depressive symptoms have on his daily functioning. Dr. Stuart's description of Dan's mental health condition help us to all better understand, and empathize with his sadness, worries, and feelings of low self-worth. Dr. Stuart provides a detailed recommendation for treatment strategies that will support Dan's rehabilitation and long-term success. I can work with Probation upon his release to identify appropriate treatment providers in Carteret, New Jersey, where he will be living, to ensure that he has access to high quality behavioral healthcare. If he fails to comply, which we do not expect, he will be violated and could be sentenced to an additional term of incarceration. Dan is aware of these consequences, and after nearly six months of detainment in two of the most notorious jails in America (Rikers Island and MDC Brooklyn), he does not want to return this setting.

When Dan and I have discussed his case, his primary concern continues to be that the Jewish community and congregants of the Chabad fear him. He worries that his family has, and will, continue to be negatively impacted by the public nature of this case. Dan worries that his conviction will make it difficult for him to find gainful employment that will enable to him to quickly pay the restitution owed to the Chabad Headquarters. He is eager to show his remorse and commitment by making things right and working hard to pay for the repairs as quickly as possible. He understands that he cannot return to the Chabad Headquarters. Dan will continue to reconcile with his actions, manage his mental health with professional help, identify healthy coping mechanisms, and rebuild trust with his loving and supportive family.

*Community based support*

This letter also provides assurance that I will continue to provide support to Dan when his term of incarceration is completed, and he transitions to supervision by the U.S. Department of Probation in the District of New Jersey. Dan will not be able to apply for medical insurance and other benefits until he is out of BOP custody. As a result, we will assist Dan by helping him apply for Medicaid, food stamps, and cash assistance upon his release. We are also happy to collaborate with his assigned Probation officer to assist in referrals to mental health providers and other programming in the community.

Dan is incredibly fortunate that his mother and brothers remain committed to supporting him. The prison experience can make social adjustment and social integration difficult upon release, but research demonstrates that social support during imprisonment facilitates the most positive re-entry outcomes, particularly that of family support, which has been found to lower recidivism rates and improve post-release mental health.[2] Upon completion of his imposed sentence, Dan will return to his mother's home in Carteret, New Jersey. His

---

[2] DeVeaux, M (2013). The Trauma of the Incarceration Experience. *Harvard Civil Rights-Civil Law Review, 48* (2), 257-277.

4

stable housing is contingent upon his compliance with U.S. Probation and his active engagement in mental health treatment, which will be mandated by Probation.

Dan's actions were highly irrational and reflective of a person who has needed more support for some time. His cries for help and desire for acceptance and spiritual guidance to combat his depressive personality opened different doors than he anticipated. Upon leaving the gates of the BOP, the doors that will open to him will give him stability, structure, supervision, and treatment. Dan is ready to see what's behind these new doors and approach his life in a new way. It will be a privilege to walk alongside him and his family on this journey.

Thank you for your attention to this matter.

Sincerely,

*Allison Berger*

Allison Berger, LMSW
Mitigation Social Worker

5

# EXHIBIT C

Honorable Eric N. Vitaliano

United States District Court

Eastern District of New York

United States Courthouse

225 Cadman Plaza East

Brooklyn, NY 11201

Dear Judge Vitaliano,

I am writing on behalf of my son, Dan. I am his mother, and I have known him for his entire life. I am also a healthcare professional, and although I understand the importance of personal responsibility, I have also seen firsthand how untreated mental illness can profoundly affect a person's thinking, judgment, and ability to function.

I understand that Dan has admitted his guilt and accepted responsibility for his actions. I am not writing to excuse what happened or to question the outcome of this case. I am writing because I hope the Court will consider the person I have known all his life and the serious mental illness that has affected him for many years.

From the time he was a young boy, Dan was naturally curious. He always wanted to understand how things worked, asked thoughtful questions, and enjoyed learning. He cared deeply about other people and often looked for ways to help those around him without expecting anything in return. He has always had a kind heart and genuine compassion, qualities that I continue to see despite the illness that has changed so much of his life.

As his mother, I watched him work very hard to build a successful life. He genuinely wanted to succeed. He held a job and made sincere efforts to keep working, even while silently struggling with his mental health. One of the most difficult things for me to witness was that he never shared how much he was suffering. Whether because he did not fully recognize the extent of his illness or because he feared being judged or viewed as a failure, he kept much of his struggle to himself. Looking back, I believe his illness prevented him from understanding how much it was affecting his life and his ability to make sound decisions.

During one of the most difficult periods of his life, when he experienced homelessness for nearly three years, Dan continued searching for purpose rather than giving up. He explored religion and faith in an effort to find hope and cope with what he was experiencing internally. He also tried to connect with other people and build meaningful relationships, even though his illness often left him isolated, fearful of rejection, and uncertain about how others would perceive him. Those efforts showed me that he had not lost his desire to become well or to find a place where he belonged.

Family has always been very important to Dan. He loves his family deeply, especially his two brothers, and they love him just as deeply. Sadly, as his mental illness progressed, those relationships became strained. The illness created distance, confusion, and pain for all of us. Despite everything that has happened, the love within our family has remained. We are hopeful that with appropriate psychiatric treatment, continued therapy, and Dan's commitment to recovery, these relationships can heal and become strong again.

Dan was recently evaluated by a psychiatrist, and I understand that he requires ongoing mental health treatment. I sincerely believe that treatment is essential if he is to address the underlying illness that contributed to his poor judgment and begin rebuilding his life. My greatest hope is that he receives the care he needs so that he can become the healthy, responsible, and productive person I know he is capable of being.

I am committed to supporting Dan throughout his recovery. I will encourage him to participate fully in treatment, follow medical recommendations, and continue making positive changes in his life. However, I also recognize that his recovery and future are ultimately his responsibility. I cannot take responsibility for the choices he has made, nor can I promise outcomes that only he can achieve. What I can promise is that he will have the unwavering love, encouragement, and support of his family as he works to rebuild his life.

I respectfully ask the Court to consider Dan's need for continued psychiatric treatment as an important part of his rehabilitation. I truly believe that with appropriate treatment, accountability, and his own commitment to recovery, he has the capacity to restore his health, rebuild his relationships with his family, and once again become a positive contributor to society.

Thank you for taking the time to consider my perspective as Dan's mother and for considering this letter.

Respectfully,

Dorota Sohail