

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EMR:EWS/BG
F. #2026R00058

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 22, 2026

By ECF

The Honorable Eric N. Vitaliano
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re: United States v. Dan Sohail
> Criminal Docket No. 26-127 (ENV)

Dear Judge Vitaliano:

The government respectfully submits this letter in advance of the sentencing of the defendant Dan Sohail, which is scheduled for July 29, 2026 at noon. The defendant previously pleaded guilty to the sole count of the above-captioned information, charging him with damaging religious property, in violation of 18 U.S.C. § 247. As described below, the defendant's crime did not occur in a vacuum. Instead, the defendant rammed his car into one of the most visible Jewish institutions in the world at a time and in a city where anti-Jewish crimes are surging. The United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") yields a range of imprisonment of 0 to 6 months. However, given the seriousness of the instant offense, the need to promote respect for the law, and the need for adequate deterrence, an above-Guidelines sentence of 14 months' imprisonment is appropriate under 18 U.S.C. § 3553(a).

I.    Background

On January 28, 2026,[1] Chabad-Lubavitch ("Chabad"), a global Hasidic philosophy, movement, and organization within Judaism, hosted an event at its headquarters located at 770 Eastern Parkway, in Brooklyn New York ("770" or the "Chabad Headquarters. PSR ¶ 1. The Chabad Headquarters is one of the most widely recognized Jewish buildings in the United States and includes a synagogue and other religious gathering spaces. Id., note 1. The event was attended by dozens if not hundreds of people, many of whom were crowded outside the building, as depicted below.

---

[1]    The Presentence Investigation Report ("PSR") includes a typographical error stating that the date of incident occurred in 2025. See PSR ¶ 1.



That evening, the defendant drove to the side entrance of the Chabad Headquarters, exited his car, removed stanchions set up to protect the building and its occupants, and gestured for various congregants to move away from the entrance. He then returned to his vehicle and, in the presence of the large crowd, drove his car into the Chabad Headquarters' side entrance. He reversed his car and re-accelerated into the entrance, repeating the process three additional times. As depicted below, the cumulative impact of deliberately crashing his car five times into the synagogue's entrance knocked the door off its hinges and destroyed the defendant's car bumper. No one was injured.

 

The New York City Police Department ("NYPD") responded to the scene immediately and arrested the defendant. During a post-arrest statement, the defendant claimed

that he lost control of his vehicle due to icy conditions and because he was wearing heavy boots, which repeatedly caused him to press the gas pedal.

## II.    Prior Proceedings

On February 24, 2026, the defendant was charged by criminal complaint with violating 18 U.S.C. § 247. He made his initial appearance on March 2, 2026, and has remained in federal custody since. On March 4, 2026, in advance of a scheduled detention hearing, the defendant got into a physical altercation with another inmate in the courthouse holding cell. The following day, the defendant refused to come to court. He refused again on March 13, 2026.

On May 13, 2026, the defendant waived indictment and pleaded guilty to an information charging him violating Section 247. ECF Nos. 13-16. The Court found a factual basis for the defendant's guilty plea and accepted it. ECF No. 16.

## III.    Sentencing Guidelines

The Guidelines Offense Level, as calculated in the PSR, is as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2H1.1(a)(3)) | 10 |
| Less:  Acceptance of Responsibility (U.S.S.G. § 3E1.1(a)) | -2 |
| Total: | 8 |

PSR ¶¶ 14–22. The defendant is in Criminal History Category I based on a criminal history score of zero. Id. ¶¶ 25-26. Thus, the applicable Guidelines range is 0-6 months' imprisonment. Id. ¶ 63.

## IV.    The Appropriate Sentence

### A.    Legal Standard

As the Court is aware, the Guidelines are advisory and not mandatory. See United States v. Booker, 543 U.S. 220, 246 (2005). However, the District Court "must consult those Guidelines and take them into account when sentencing." Id. at 264. As the Supreme Court has instructed, courts must "begin all sentencing proceedings by correctly calculating the applicable Guidelines range…[and] the Guidelines range should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007). The Court must also consider the factors specified in 18 U.S.C. § 3553(a) and explain its chosen sentence, including any deviation from the Guidelines range. United States v. Bonilla, 618 F.3d 102, 109 (2d Cir. 2010). A final sentence should be based on the individual facts of a case and if the Court decides that a sentence outside the Guidelines range is appropriate, the Court must "ensure that the justification is sufficiently compelling to support the degree of the variance." Gall, 552 U.S. at 50.

After determining the applicable Guidelines range, the Court must turn to the factors set forth in Title 18, United States Code, Section 3553 and "impose a sentence sufficient

3

but not greater than necessary" to achieve the purposes of sentencing.  18 U.S.C. § 3553(a).  These considerations include the need for the sentence:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).  See also Booker, 543 U.S. at 260.  In addition to these factors, the Court must also consider the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available; the kinds of sentence and the sentencing range established in the Guidelines; any pertinent policy statements from the United States Sentencing Commission; the need to avoid unwarranted sentence disparities; and the need to provide restitution to any victims.  18 U.S.C. § 3553(a).

An above-Guidelines sentence—such as the 14 months' imprisonment that the government seeks here—is evaluated by the Second Circuit for procedural and substantive reasonableness.  "A district court errs procedurally when it fails to calculate (or improperly calculates) the Sentencing Guidelines range, treats the Sentencing Guidelines as mandatory, fails to consider the [18 U.S.C.] § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails adequately to explain the chosen sentence."  United States of Am., Appellee, v. Justin Patterson, Defendant-Appellant., No. 24-2320, 2026 WL 2017249, at *1 (2d Cir. July 13, 2026) (quoting United States v. Alvarado, 720 F.3d 153, 157 (2d Cir. 2013)).  When there is "no significant procedural error," the appellate court then "considers the substantive reasonableness of a sentence imposed under an abuse-of-discretion standard, taking into account the totality of the circumstances, including the extent of any variance from the Guidelines range."  United States v. Rigas, 583 F.3d 108, 121 (2d Cir. 2009) (cleaned up).  Only in exceptional cases, where the trial court's decision "cannot be located within the range of permissible decisions," will the Second Circuit set aside a district court's substantive determination.  Id. at 121-22 (cleaned up).

4

B.    The Above-Guidelines Sentence is Warranted

The government appreciates that the starting point at sentencing is the applicable Guidelines range.  Here, however, imposing a sentence within the applicable range of 0-6 months' imprisonment would not achieve the goals of sentencing under Section 3553(a).  The seriousness of the offense, the need to promote respect for the law and protect the public, and the need for general deterrence all call out for greater punishment.  A term of imprisonment of 14 months is appropriate.

1.    The Seriousness of the Offense and Promoting Respect for the Law

The defendant committed a serious crime.  He intentionally damaged a religious property—and not just any property, but a synagogue housed within an iconic Jewish building with global significance.  By deliberately ramming his car into the Chabad Headquarters, the defendant attacked a sacred Jewish institution precisely because of the building's religious character.  When a person intentionally damages or destroys religious property, the crime is naturally understood by members of the religion as an attack on them.  This case is no different.  Whether or not the defendant's crime was motivated by animus for Jewish people,[2] his crime was perceived by the community as the latest in an avalanche of anti-Jewish crimes.  The general public immediately perceived it that way as well; in fact, law enforcement's immediate concern was whether a terror attack had just occurred.  This context makes the defendant's crime all the more serious and should be factored into the sentence the Court imposes.

The details of the offense are also aggravating.  The defendant deliberately damaged the Chabad Headquarters on the night of an event commemorating the death of one of the Chabad movement's leaders.  That fact is both symbolically and practically significant.  When the defendant attacked the building, he did so in the presence of large crowds of people gathered outside and inside the synagogue.  It is fortunate no one was injured.  And though the defendant gestured for congregants to move out of the way, he did so precisely so he could complete a violent and dangerous crime.  The defendant also rammed his car into the synagogue entrance *five* times; each time he accelerated, he placed untold people in extraordinary danger.  The end-result of the defendant's car is proof of how lucky he was that no one (himself included) was hurt.

The Guidelines do not adequately account for these facts.  They do not meaningfully distinguish between non-violent crimes like graffitiing, for instance, and dangerous car-ramming attacks.  Nor do they account for the dozens if not hundreds of people the defendant placed in immediate peril.  Even the cost of the property damage—here, nearly $20,000—is not reflected in the Guidelines.  Because the Guidelines dramatically understate the nature of the offense, an upward variance is warranted.

---

[2]    As the defendant contends, the government acknowledges that it has not developed evidence indicating that the defendant's crime was motivated by animus for Jewish people.  Nevertheless, as the defendant acknowledged during his allocution, the fact remains that he intentionally damaged the Chabad Headquarters because of its Jewish character.

2.      Protecting the Public from Future Crimes of the Defendant and Promoting Respect for the Law

The defendant has not shown adequate respect for the law. After the defendant was arrested by the NYPD, the defendant made numerous false statements describing his deliberate car ramming as an accident caused by ice and the boots he was wearing. He was uncooperative during his federal arrest, skipped court twice, and missed a third court date because he violently fought with another inmate before the proceeding. Though the defendant is in Criminal History Category I, the defendant's conduct during the prosecution of this case, coupled with the violent nature of the offense, is cause for concern that he will re-offend—concerns that are magnified by the defendant's mental health issues. A 14-month sentence appropriately balances the nature of the offense with the need to ensure that the defendant does not harm others in the future.

3.      Affording Adequate Deterrence

The Court's sentence should send a clear message that attacks on religious people and institutions will be met with stiff punishment. Damaging religious property is categorically abhorrent, but it is impossible to consider this case divorced from the reality of what Jews across New York City are experiencing today. According to the NYPD Hate Crimes Dashboard, from January 1, 2026 to March 31, 2026, there were 146 hate crime incidents across New York City, resulting in 49 arrests. Of these figures, a staggering 80 incidents and 19 arrests were based on crimes against Jews and Jewish institutions.[3] To put those numbers into perspective, though Jews comprise roughly 10% of New York City's population, they are targeted in hate crimes in the city more than all other groups combined every month. See Luke Tress, Antisemitic Hate Crimes Spiked in New York City Last Month — Police Data, Times of Isr. (June 4, 2026), https://www.timesofisrael.com/antisemitic-hate-crimes-spiked-in-new-york-city-last-month-police-data/ (citing NYPD data). In May 2026 alone, there were "41 confirmed hate crimes targeting Jews in the city," which "amounted to 60 percent of all hate crimes in the city," averaging out to "one antisemitic hate crime every 18 hours." Id. And, to be sure, 2026 is no outlier. Crimes against Jewish people and property have dramatically risen over the past few years.[4]

In light of these dangerous trends, the need for general deterrence is high. See United States v. Cavera, 550 F.3d 180, 196 (2d Cir. 2008). But the Guidelines do not account for those trends. A Guidelines sentence, therefore, simply would not provide adequate deterrence. In fact, it would send the opposite message: that attacks against Jewish people or property will be met with minimal punishment. In today's climate, that simply should not be the message that the

---

[3]      These figures are available at https://www.nyc.gov/site/nypd/stats/reports-analysis/hate-crimes.page.

[4]      See, e.g., The Editorial Bd., Antisemitism Is an Urgent Problem. Too Many People Are Making Excuses, N.Y. Times (June 14, 2025), https://www.nytimes.com/2025/06/14/opinion/antisemitism-jewish-hate.html ("Antisemitic hate crimes more than doubled between 2021 and 2023, according to the F.B.I., and appear to have risen further in 2024. On a per capita basis, Jews face far greater risks of being victims of hate crimes than members of any other demographic groups.").

Court's sends through its imposition of sentence, particularly in a case like this, where the defendant's conduct was so dangerous.

## V.    Restitution

As a result of the defendant's crime, the victim suffered financial losses totaling $19,010.21 in costs to repair the damage to the Chabad Headquarters. Pursuant to 18 U.S.C. § 3663A and in accordance with the defendant's plea agreement, the government respectfully requests that the Court order the defendant to pay that amount in restitution.

## VI.    Conclusion

For the foregoing reasons, the government respectfully submits that a significant sentence of at least 14 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:    /s/ _____
Eric Silverberg
Brachah Goykadosh
Assistant U.S. Attorneys
(718) 254-6365/6237

cc:    Clerk of the Court (ENV) (by Email and ECF)
Mia Eisner-Grynberg, Esq. (by Email and ECF)
Probation Officer Erica Vest (by Email)